[Civ. No. 21125.   First Dist., Div. Three.   Apr. 26, 1963.]

VICTOR RIGOLFI et al., Petitioners, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; D. BRUNETTI, Individually and as Trustee, etc., et al., Real Parties in Interest.

Richard G. Logan for Petitioners.

No appearance for Respondent.

Donahue, Richards & Gallagher, Richard W. Brooke and Joseph I. Richards for Real Parties in Interest.

DEVINE, J.—Plaintiffs Rigolfi and Rosi commenced an action on September 3, 1959, for an accounting and to impress a trust against their partners in a flower business, Brunetti and Domilla. A few months before the suit was started, another partner, Stefano Costa, had died and Bank of America had been appointed executor of his will. His widow demanded that the bank join as party plaintiff, but it refused and was made a defendant. All of the legatees and devisees under the will, including the decedent's widow, entered the action as plaintiffs, and made various motions to have the bank removed as executor. After some months had gone by the bank petitioned to withdraw and was allowed to do so on August 10, 1961.

Thereupon Margaret Costa, widow of Stefano, nominated William D. Corbett and Clifford B. Bachand, who are lawyers, to be administrators, and they were appointed and qualified on August 22, 1961. On September 18, 1961, the administrators filed a supplemental complaint by which they substituted themselves for the heirs and legatees, and dropped the bank as a party defendant.

Bachand and Corbett have been counsel for plaintiffs Rigolfi and Rosi at all times during the litigation, they have been attorneys for the legatees and devisees under the Costa will, and they have been attorneys for themselves as administrators. A few days before the hearing of the argument in the matter before us, which was on March 19, 1963, they resigned as administrators and Mrs. Costa, the widow, was appointed administratrix. They continue to represent her, as an individual and as administratrix. On June 27, 1962, and September 6, 1962, counsel for defendants Brunetti and Domilla (real parties in interest in this proceeding and defendants in the principal action) took the deposition of Clifford B. Bachand, and in September 1962, the deposition of William D. Corbett. These lawyers refused to answer certain questions upon the ground that they call for information that is privileged under the attorney-client privilege. On certification proceedings instituted by the defendants, the superior court ordered that the witnesses answer the questions. Plaintiffs Rigolfi and Rosi, individually, and Bachand and Corbett, as administrators, filed a petition for writ of prohibition to restrain the superior court from taking any steps to enforce its order directing Bachand and Corbett to answer the questions.

These questions are of three kinds: (1) Questions in which the lawyers were asked whether their clients had consented to their acting as administrators of the Costa estate. We shall not discuss these at length, because although the questions were defective in form, the parties appear willing to assume, for the purpose of this writ, that the other parties plaintiff "consented" in the sense that they knew that their attorneys were petitioning for appointment as administrators and did not object. (2) Questions in which the interrogator sought to elicit from the lawyers communications made by their clients, coplaintiffs, to said lawyers subsequent to their appointment as administrators on August 22, 1961. A sample of this kind of question is the following: "All right, Mr. Bachand, subsequent to August 22nd, 1961, have any of your co-plaintiffs, again other than Mr. Corbett, told you that they realized they

were renting certain properties from Mr. Brunetti person-ally?" (3) Questions in which the interrogator asked the attorneys about any conversations with witnesses other than the parties to the cause, or statements obtained by the attorneys from such witnesses at times subsequent to their appointment as administrators.

### Questions Relating to Communications Made to the Attorneys by Their Clients, Coplaintiffs

A brief examination of the history and rationale of the attorney-client privilege is thought to be useful here, not for the purpose of justifying the privilege, because the Legislature has protected it explicitly, but for the purpose of considering how it should be construed in respect of the claimed waiver. The prerogative is an ancient one, which was known to the common law from the time of Elizabeth I, and probably from the beginning of the compulsion of witnesses to testify. (8 Wigmore, Evidence, § 2290, pp. 542-543.) Until 1776, however, the privilege was not deemed that of the client but that of the attorney, as a "point of honor," a part of the professional accoutrement of the gentleman of the law. In that year, there was tried in the House of Lords the case of the Duchess of Kingston, a peeress charged with bigamy, and in the course of her trial her counsel was asked by one of the lords about her conversations with him as to a marriage some three decades earlier. The duchess herself, as prisoner before the house, stated that she exempted him from secrecy. The attorney nevertheless demurred, raising the point of honor. The House of Lords recessed to consider his objection, and upon reconvening directed him to answer. The attorney testified, relating conversations 30 years old which were harmful to his client. From that time, the genteel point of honor theory, which would henceforth subordinate the attorney's claim to court order, came to an end. (20 Howell, State Trials (1776) 355, 586.) During the eighteenth century, however, another theory had been developing, that of protecting the client from disclosure of secrets entrusted to the lawyer, rather than of simply allowing the lawyer to keep the client's confidences as a professional prerogative; and on the dramatic collapse of the earlier conception, the newer theory came to the fore, and gained acceptance over the succeeding decades. (Wigmore, supra, § 2291, p. 545.) A necessary result of the change in theory is that the privilege no longer could be waived by the attorney, as he might deem it proper to waive, but by the client only, a proposition which Professor Wigmore

says "is now never disputed." (*Id.*, § 2321, p. 629.) ■ In California law, the privilege and the attorney's obligation find expression in section 1881 of the Code of Civil Procedure: "There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the following cases: . . . 2. An attorney cannot, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment"; and in section 6068 of the Business and Professions Code: "It is the duty of an attorney: . . . (e) To maintain inviolate the confidence, and at every peril to himself to preserve the secrets, of his client."

That the privilege is the client's is stated in case law, too. (*People* v. *Kor*, 129 Cal.App.2d 436, 444 [277 P.2d 94]; *Abbott* v. *Superior Court*, 78 Cal.App.2d 19, 21 [177 P.2d 317].) ■ In the case before us, then, we must regard the action or inaction of the clients in deciding whether there has been waiver, considering the attorneys' action only in reference to whatever adoption of it may be imputed to the clients.

■ It is argued by the real parties in interest that the direction of the superior court that the witnesses answer is consistent with the modern attitude of the Legislature and of the courts in the matter of discovery, and that the privilege, being a means by which the truth may be concealed, must be strictly construed. (*Greyhound Corp.* v. *Superior Court*, 56 Cal.2d 355, 396-397 [15 Cal.Rptr. 90, 364 P.2d 266].) This is the modern extension of a dispute about lawyers' privilege which has gone on for more than a century, in which Bentham is leading attacker of the privilege (Bentham, Rationale of Judicial Evidence, Book IX, pt. IV, ch. V, p. 472) and Wigmore its chief champion.

It is true that the privilege is to be strictly construed (*Greyhound Corp.* v. *Superior Court, supra,* p. 396; *Brunner* v. *Superior Court,* 51 Cal.2d 616, 618 [335 P.2d 484]; *City & County of San Francisco* v. *Superior Court,* 37 Cal.2d 227, 234 [231 P.2d 16, 25 A.L.R.2d 1418]), a proposition conceded by Wigmore, following his defense of privilege in principle. (Wigmore, *op.cit.,* p. 554.) Within its range, however, it exists by our statutes and is supported by the logic that unless the client makes known all the facts, which he will do only under the privilege, the advice which follows will be useless, if not misleading, the lawsuit will be conducted along improper lines, the trial will be full of surprises and much

useless litigation may result. (*City & County of San Francisco v. Superior Court, supra*, p. 235.) Moreover, the absence of the privilege would convert the attorney habitually and inevitably into a mere informer for the benefit of the opponent. (*City & County of San Francisco* v. *Superior Court, supra*, p. 235; Wigmore, *op.cit.*, § 2380a, p. 831.) The questions propounded to the lawyers in the depositions in this case call for disclosure of direct communications by the clients to the lawyers, and fall squarely in the center of the privilege. Answers cannot be compelled unless there has been waiver by the clients.

▉ No express waiver is asserted by real parties in interest, but a waiver by implication is claimed. In deciding the matter of waiver by implication, we believe it is proper to take into consideration "not only the element of implied intention, but also the element of fairness and consistency." (Wigmore, *op.cit.*, § 2327, p. 636.) In this case, what did the *clients* do? At most, they were agreeable to the appointment of their counsel as administrators and to their becoming coplaintiffs. There is nothing to indicate that there was a plan to silence these coplaintiffs, by preventing discovery of information which would come to the administrators from outside sources. There is nothing to show abuse of the attorney-client privilege. There is nothing to show that defendants, real parties in interest, lost anything that they would have had if someone else had been appointed administrator.

On the other hand, to require divulging of what the principals told their attorneys, merely because the latter became administrators of the estate of a deceased coplaintiff, would seem unfair and a destruction, without warning, of a privilege which the clients did not intend to waive. Fairness seems to us to lie on the side of plaintiffs; wherefore, the writ will issue to prevent enforcement of the order requiring answers to those questions which have to do with communications between the clients and their lawyers.

### Questions Relating to Information Obtained from Nonclients

▉ As to these questions, there is no privilege. (*Suezaki* v. *Superior Court*, 58 Cal.2d 166 [23 Cal.Rptr. 368, 373 P.2d 432]; *Trade Center Properties, Inc.* v. *Superior Court*, 185 Cal.App.2d 409 [8 Cal.Rptr. 345].) ▉ The trial court has discretion to determine whether, under all of the facts, discovery is allowable, and the burden of showing need for protection rests on the party claiming such need. (*San Diego*

*Professional Assn.* v. *Superior Court*, 58 Cal.2d 194 [23 Cal. Rptr. 384, 373 P.2d 448].) We do not find an abuse of discretion by the trial court in the matter of this set of questions.

Let a peremptory writ issue as to that class of questions which calls for the disclosure of clients' communications to their attorneys. As to all other questions, a peremptory writ is denied and the alternative writ is discharged.

Draper, P. J., and Salsman, J., concurred.

A petition for a rehearing was denied May 21, 1963.